UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————X

RAYMOND JACKSON,                    :

                    Plaintiff,      :

        -against-                            16-CV-0267(NSR)
                                    :

DOWNSTATE CORRECTIONAL FACILITY,    :
S. REYES(C.O.), C.O. THOBEN,
                                    :

                    Defendants.     :

————————————————————————————X


PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
OPPOSING DEFENDANTS' FOR SUMMARY JUDGMENT


Raymond Jackson,
[Pro Se] Plaintiff

## PRELIMINARY STATEMENT

Plaintiff, Raymond Jackson respectfully, submit this memorandum of law in support to oppose defendants' for summary judgment pursuant to Fed. R. of Civ. P. 56.

The defendants contends that the plaintiff was the one who became agited, and began, "waving his arms around yelling, "Don't f**k with my legal papers," and threatening to "grieve my ass" if his papers were mishandled." (C.O. Reyes Decl.). The defendants are also claiming that the plaintiff was created a disturbance to the other 20 inmates inside the visit room # 2 (C.O. Reyes Decl., Def's Memorandum p. 1). And that the plaintiff had to be removed to an outside area because the defendants' wanted to ensure the plaintiff abusive conduct did not incite other inmates (C.O. Reyes Decl., Def's Memorandum p. 1).

The defendants' did concede to the plaintiff's accounts of the incident that took place outside the visit room # 2, (Def's Memorandum p. 1). The defendants' also acknowledge that C.O. Reyes told the plaintiff to make his nose touch the wall. (Def's Memorandum p. 1).

The defendants' claim that no jury could find that simply holding the arm of an uncooperative inmate for 35 seconds, then releasing him when assitance arrived, constituted a malicious and sadistic application of un-neces-sary force. (Def's Memorandum p. 1).

The defendant's claims are false, and misleading, because had the plaintiff became agited, "waving his arms around," yelling, "Don't f**k with my legal papers," which clearly indicate aggressive behavior. Then the other C.O.'s that were also present inside the visit room # 2, would have came to the aid of the defendants. There were about three, or four, C.O. inside the visit room, not counting the defendants' (Plaintiff Depo.(2018) P: 154).

1.

Sotherefore, if the plaintiff was carrying on in a aggressive manner, or being agited, waving his arms around, the way the defendants' suggesting. Then that kind of behavior would also be affecting the other officer's to perform there job as well, if the plaintiff was acting out, created a disturbance. And there is no other sworn declaration from the other officer's to back up the defendants' claims, who was also present inside the visit room.

The defendants claim that holding the arm of an uncooperated inmate for 35 seconds does not constitute a malicious and sadistic application of unnecessary force. The Defendants' first directed the plaintiff to put his hands on the wall first, and the plaintiff did comply (See Plaintiff Depo.(2018), p. 169-171). And when the plaintiff put his hands on the wal then, they wanted the plaintiff to place his nose on the wall, touching it (Plaintiff Depo.,p. 169). When the plaintiff did not comply to put his nose on the wall, that is when defendant C.O. Thoben told the plaintiff to put his nose on the wall, piggybacked off of C.O. Reyes, and when the plaintiff told both defendants' "I'm not putting my nose on the wall." That is when both defendants' got aggressive with the plaintiff. (See Plaintiff Depo., p. 176).

The defendants' actions was malicious and sadistic, and unnecessary force, because the plaintiff complied with the direct order by putting his hands on the wall, giving himself up, not being a threat, if the defendants' felt threaten. That is how the defendant's manage to grab hold of the plaintiffs' arm, because the plaintiff had his hands on the wall, in compli-ance with the defendants direct order. The defendants' did not use the use of excessive force in good faith to restore order, but the use of force was use in bad-faith, because the plaintff was not being aggressive, or resisting, the plaintiff was being compliant by placing his hands on

2.

the wall, giving himself up. There were no legitimate reason whatsoever, by the defendants' damanding the plaintiff to put his nose on the wall, otherthan to humilate, and embarasses the plaintiff, where as, the plaintiff was being compliant by placing his hands on the wall. It was the defendants' who was agited, and became aggressive with the plaintiff, when the plaintiff reference the words of C.O. Thoben, "He got it," in regards to untie the "knot." (Plaintiff Depo., (2018) p.-158 ¶6-18). And when they damanding the plaintiff to make his nose touch the wall, after the plaintiff already had his hands on the wall, complying. And when the plaintiff told them no, thats when the defendants got aggressive, and grab the plaintiffs' right arm, pined it against the back lifting up, and the plaintiff was on his tip toes screaming in pain. (See Plaintiff Depo., (2018) p. 173 ¶12-17 p. 176 ¶11-17 ¶19-25, p. 177 ¶7-25, p. 178 ¶2-12). When SGT. Nunez arrived the defendants' still had the plaintiff arm twisted in an awkard position pined agaisnt his body, and SGT. Nunez gave the defendants' a looked; "what are you doing." And she made a grunt sound looking at C.O. Reyes to release me, and he did. And I overheard SGT. Nunez, "What are you doing? he's leaving tommorow. He's going on the draft." (Plaintiff Depo., (2018) p. 178 ¶15-19, p. 184 ¶6-14).

I told SGT. Nunez that I was in pain, and that I need medical treatment, and that the defendants' twisted my arm. At first SGT. Nunez told me I 'll get medical treatment, but the plaintiff was denied treatment that day. I was never placed in restraints (handcuffs) and I descibe a black C.O. escorted me back to the blocks. And The housing officer made a phone call for the plaintiff, to see if the plaintiff can get medical treatment. And the C.O. was told to tell the plaintiff to get it in the morning. (See Plaintiff Depo., (2018) p. 184 ¶9-13 p. 199 ¶11-25).

The plaintiff and SGT. Nunez never had a conversation pertaining to my legal work, other than asking SGT. Nunez for medical treatment. SGT. Nunez is not being forthcoming in her declaration. Also SGT. Nunez stated in her declararion, that the plaintiff had his hands

3.

behind the back when she arrived. (See SGT. Nunez Decl.). However, SGT. Nunez is not being transparent about if the plaintiff had his hands behind the back vuluntarily, or did she see the defendant's twisting the plaintiff right arm, when she arrived. If SGT. Nunez is reference that the plaintiff had his arm behind the back vuluntarily, when she arrived. Then that will contradict the defendants' notion that the plaintiff was an uncooperative inmate. The defendants also claim that holding a uncooperative inmate, arm for 35 seconds or less, is not malicious and sadistic. However, the defendants' are misstating the plaintiff account of the incident, and the duration of the holding of the plaintiff right arm. The palintiff was simply stating that when the defendants' twisted the plaintiff arm, and pined the right arm against the plaintiffs' body, and then, lifted up, the plaintiff right arm. The lifting the arm, lasting for approximately 30 seconds or more. But the defendants held the plaintiffs' right arm twisting it, until SGT. Nunez arrived, approximately 2 minutes. (See Plaintiff Depo., (2018) p. 173 ¶2-9, p. 182 ¶6-12, p. 183 ¶2-25, ¶20-25,).

The plaintiff can show evidence of genuine material issue of facts, that a jury might rule in the favor of the plaintiff. The plaintiff has maintained that SGT. Stevens took photo's of the plaintiff's injury, and also a statement from the plaintiff on October 9, 2015. Counsel for the defendants' Bruce J. Turkle, gave the plaintiff an email exchange between SGT. Stevens, and Bruce J. Turkle, that is heavily redacted, and it is not clear, what is being said about the events that occurred on October 9, 2015, (See Plaintiff Ex. 1). Given that there is no sworn declaration from SGT. Stevens, that refute, or contradicts the plaintiff's claims, of the interaction the plaintiff had with SGT. Stevens on October 9, 2015, in regards of the photo's taken of the injury, a statement, and the plaintiff's excessive force claims committed by the defendants.

The defendant's have not produce any documents pertaining to the photo's and statements that SGT. Stevens, had taken of plaintiff's injury, and the account of the incident on October 8, 2015. Whereas, the plaintiff request those documentation during the interrogatory stages, (See Plaintiff Ex. 2, and 3,). However, according to C.O. Reyes memorandum dated, October 9, 2015, addressed to SGT. Nunez, not only does it contradicts the notion that the documents does not exist, but to the contrary, it shows the documents did exist on record that back up the plaintiff's claims, of the events on October 9, 2015. This is completely based on the statement by C.O. Reyes that reference, "being a born again christian." (See Def's Ex. 1, C.O. Reyes Memorandum).

The plaintiff was instructed by SGT. Stevens to write down about the incident on October 8, 2015, every last detail of what took place outside the visit room. While the incident was still fresh in my mind, I did mentioned the words, "born again christian," in the October 9, 2015, statement that was given to SGT. Stevens, that was said to me by C.O. Reyes. Three weeks after the incident, the plaintiff filed a grievance at Clinton Annex, dated October 26, 2015, where the plaintiff mentioned that same exact statement, that was reference by C.O. Reyes, "Born again Christian. (See Plaintiff Ex. 4). It is physically impossible for C.O. Reyes, to know about the plaintiff's grievance dated, October 26, 2015, where the plaintiff wrote down that statement by C.O. Reyes. Which clearly suggest that someone bought that to the attention of C.O. Reyes at Downstate C.F. Moreover, C.O. Reyes mentioned that the plaintiff's allegation are false, in his memorandum (Def' Ex. 1). Eirther someone read the plaintiff statement to C.O. Reyes, or C.O. Reyes read it himself. In either case, this shows that the photo's and the statement was taken by SGT. Stevens on October 9, 2015, in correlation with C.O. Reyes,

5.

memorandum dated, October 9, 2015, refuting the plaintiff's allegations, stated, in C.O. Reyes memorandum. A jury might want to hear testimony by SGT. Stevens, was he the one person to bring that to the attention of C.O. Reyes, because SGT. Stevens is the sole person the plaintiff gave the statement too, that quoted C.O. Reyes. Moreover, the jury might want to know what happened to those documents, were they destroyed, are they being suppressed, this is a genuine issue of material facts, because if the jury believe this is a cover-up, by the defendant's, they may rule in favor of the plaintiff.

Also, the expert opinion by Dr. macelaru, and Dr. Weinstein, in regards to the plaintiffs' injury, and how the plaintiff describes how the injury occurred, and that it is inconceivable, how the way plaintiff describes it. (Dr. macelaru Decl.). Dr. Macelaru who performed the surgery on May 1, 2017, stated the palintiff suffered a mild cubital tunnel sydrome release (Dr. Macelaru Decl., ¶4). Specialist J. Syrotski who performed an EMG on January 31, 2017, is the one recommended surgery, because he told the plaintiff there might be some damage to the nerve (Plaintiff Decl.) A jury might want to know if the plaintiff's injury is inconceivable the way the plaintiff describes it, then why did Dr. Macelaru had to perform surgery to release compression of the nerve, for a mild cubital tunnel sydrome. Both Dr. Weinstein, and Dr. Macelaru, had stated, that cubital tunnel sydrome is caused by repetitive flexing, and extending the elbow, or sleeping on the elbow, (Dr. Weinstein Decl., ¶7). Dr. Macelaru, even suggested that the injury is due to prolonged periods of bending the elbow wile sleeping, or on the phone. (Dr. Macelaru Decl., ¶4). Then how come the plaintiff never made any compliants about pain in the elbow area, and also, why did this required surgery, to release compression of the nerve. The surgery was performed on the plaintiff's right elbow, because the

6.

plaintiff was in pain, due to the injury the plaintiff suffered at the hands of the two defendants' on October 8, 2015. Also, Dr. Macelaru never gave me his opinion, how the injury occured or how the pain occured, in the right elbow. He offer to put stents in the arm, and gave the plaintiff a corisone shot for the pain. However, the plaintiff told Dr. Macelaru, that pain is from the injury, (See Plaintiff Depo., (2018) p. 126 ¶5-25, p. 127 ¶3-23).

Dated : August 24, 2019.
         Ossining, NY 10562

Respectfully submitted,

*Raymond Jackson*

Raymond Jackson # 15A3740
[Pro Se] Plaintiff
Sing Sing C.F.
354 Hunter St.,
Ossining, NY 10562

7.

## STATEMENT OF FACTS

On October 8, 2015, inside the draft room defendant C.O. Thoben was having

tough time trying to untie a shoe string that was tied into a knot. The

plaintiff went to attempt to give C.O. Thoben some help, C.O. Thoben said,

"I got it." Then defendant C.O. Reyes asisting that the plaintiff untie the

knot for his partner (Plaintiff Depo. p. 108, 113). The defenadnt C.O.

Reyes did not like the plaintiff response how the plaintiff repeated the

words of C.O. Thoben, "He said he got it." (Plaintiff Depo. p. 155-156,

158-159, 160-161,). C.O. Reyes began saying how he was a "born agin

christian," and how he cared about the plaintiff, but he did not like how

the plaintiff responded, "he got it." (plaintiff Depo. p. 156). The

defendants' C.O. Reyes threatening tone, ""your shit won't get pack," that

the plaintiff legal work can come up missing and they won't be responsiabl.

(Plaintiff Depo. p. 160-163). The defendant C.O. Reyes told the plaintiff

your interview is terminated, and the plaintiff was asked to step outside,

(Plaintiff Depo. p. 163). C.O. Reyes told the plaintiff to put his hands

on the wall, and the plaintiff did complied with the direct order, (See

Plaintiffs' Depo. p. 169, 173, 176,). Then, C.O. Reyes order the plaintiff

to "make your nose touch the wall," while the plaintiff still had his up

on the wall, (See plaintiff Depo. 169-170). And thats when C.O. Thoben,

told the plaintiff, "put your nose against the wall," and when the plain-

tiff did not comply, to to put my nose up against the wall, the defendants

got physical aggressive with the plaintiff, (See Plaintiff Depo. p. 171,

173, 176,). The defendants' used excessive force that was unnecessary,

when the defendants' grab hold of the plaintiff right arm and twisted , in

a akward position pined up agaisnt the plaintiffs' body lifting the arm

up, where the plaintiff was on his tip toes, screaming in pain, (See

Plaintiff Depo. p. 177-180).

And it should be noted, the plaintiff has never had any compliants about the right arm, or elbow, during his time in society, nor in any prison facilty. The plaintiff did not had any compliants when he arrived at DownState C.F., nor on the morning day, when the plaintiff woke up for the 6am count on October 8, 2015, or asking to see medical because of any pain. It was only when the defendants' used excessive force with maliciously and sadistically to cause harm, that late evening, on October 8, 2015. The defendants' assume that, being that the plaintiff described the in-cident "fast and quick," lasting for 35 seconds, did not constitute a VII Amend. violation of maliciously and sadistically to cause harm (See Def's Memorandum p. 1).

However, 35 seconds can fell like an eternity, if someone is twisting a person arm awkardly, and then pined the arm up against a person body, and then lifted it up, can cause significant harm, and possible pinch a ulnar nerve. Because a person body part (arm), is not designed for twisting. Secondly, a significant injury can occurr and cause harm within 30 seconds or less, it does not matter if the incident was "fast and quick." The question is, did the defendants' cause enough damage within the 35 seconds time frame, by inflicted pain that cause harm, and injury, to the plaintiff ulnar nerve that required surgery.

The defendants' excorted the plaintiff outside the visit room # 2, be-cause C.O. Reyes was visibly upset with the plaintiff because the plain-tiff called out C.O. Reyes, for saying he was a born again christian, and then using profanity towards the plaintiff, and the plaintiff reply, "I thought you were a christian." (Plaintiff Ex. 4, Depo., p. 156 ¶9-25). And then C.O. Reyes threaten that my property can come up missing, C.O. Reyes tone trigger me. The plaintiff has been hospitalized for mental health issue's in the past, and the plaintiff represented himself pro se,

9.

at trial, and was found guilty on all counts on July 1, 2015. C.O. Reyes
was in the wrong for saying my legal work (property), will come up missing,
all because  C.O. Reyes did not like how the plaintiff reference the words
of his partner C.O. Thoben, "He got it." (the tied knot). So the plaintiff
responded emotional, "I'll grieve your ass."

Then the defendant's excorted the plaintiff outside and order the plaintiff
to put his hands on the wall, and the plaintiff complied (See Plaintiff
Depo., (2018) p. 169 ¶18-24 p. 173 ¶12-17 p. 176 ¶3-12).  And then they
wanted the plaintiff to put his nose on the wall as well, while the plain-
tiff had his hands on the wall. (Plaintiff Depo., (2018) p. 169 ¶18-24,
p. 173 ¶12-17, p. 176 ¶3-12,).  And when the plaintiff told the defendants
"i'm not doing that." The defendants' applied excessive force with intent,
maliciously and sadistically to cause harm, in violation of the plaintiff
VII Amendmend Constitutional right, of cruel and unusual punishment.
Because the plaintiff complied with the direct order by placing his hands
on the wall, given himself up.  Therefore, the defendants' should not be
afforded immunity, or afforded summary judgment, because the defendants'
action is the reason the incident had occurred, and the cause of the plain-
tiff's injury the the plaintiff suffered on October 8, 2015.


### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, anwsers to
interrogatories, and admission on file, together with affidavits, if any,
show that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)
"In reaching this determination, the court must assess whether there are
any material factual issues to be tried while resolving ambiguities and
drawing reasonable inference against the moving party, and must give extra

latitude to a pro se plaintiff." <u>Thomas v Irvin</u>, 981 F.Supp. (W.D.N.Y.

1997). A fact is "material" only if it has some effect on the out-come

of the suit. <u>Anderson v Liberty Lobby, INC.</u>, 477 U.S. 242-248, (1986).

A dispute regarding a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

<u>Anderson</u>, 477 U.S. at 248; <u>Bryant v Maffucci</u>, 923 F.2d 979 (2d Cir.1991).

When dealing with summary judgment motions in a Pro Se cases, Courts in

this Circuit must "read the pleadings of a Pro Se plaintiff liberally and

"raise the strongest arguments that they suggest." Pleadings drafted by

Pro Se Plaintiffs moving for summary judgment are not held to same "strin-

gent standards" as "formal pleadings drafted by lawyers," <u>Shariff v Poole</u>

689 F.Supp.2d 470, 476 (S.D.N.Y. 2010). "When considering a motion for

summary judgment, a Court must construe the evidence in light most favor-

able to the nonmoving party, drawing all inferences in that party's favor.

<u>Jeffrey</u>, 426 F.3d at 533; <u>M.T. v City of New York</u>, 325 F.Supp.3d 487, 494

(S.D.N.Y. 2018). "It is the movant's burden to show that no genuine

factual dispute exsist." <u>Vt. Teddy bear Co. v 1-800 Beargram Co.</u>, 373

F.3d 241-244, (2d. Cir. 2004).


## ARGUMENT

### POINT I

**THE EXCESSIVE FORCE APPLIED BY THE DEFENDANTS WAS UNREASONABLE
AND IMPLICATED THE EIGHTH AMENDMEND CONSTITUTION RIGHTS**

It is typically the jury "unique task to determine the amount of force

used, the injuries suffered and the objective reasonableness of the

officer's conduct." <u>Breen v Garrison</u>, 169 F.3d 152, 153 (2d. Cir. 1999).

Thus, a plaintiff generally must prove he sustained some injury to prevail

on an excessive force claim. <u>McAllister v N.Y.C. Police Dep't</u>, 49 F.Supp.

2d 688, 699 (S.D.N.Y. 1999); see also  Landy v Irizarry, 884 F.Supp. 788,
798 (S.D.N.Y. 1995). ("An arrestee must prove some injury, even if insig-
ni-ficant, to prevail in an excessive force claim."). In other words, a
plaintiff must show that the defendant acted with "wantonness in light of
the particular circumstances surrounding the challenged conduct." (Wright,
554 F.3d at 268). Wantonness ask "whether the force was used in a good-
faith effort to mainttain or restore discipline, or maliciously and sadis-
tically to cause harm." (Hudson, U.S. at 7, 112 S.Ct. 995; Scott v
Coughlin, 344 F.3d 282, (2d. Cir. 2003).

Here, there is a genuine issue of material facts as to whether defendant's
used excessive force against the plaintiff. Because onthe one hand,
defendant's claim no force was used on the plaintiff. (See Def's C.O. Reyes
Decl., and Def's Ex. 1 disciplinary report). On the other hand, the de-
fen-dants' claim, because the plaintiff testified they held the plaintiff
arm for 30 and 40 seconds behind the back, was de minimus force and cannot
support an Eighth Admendment claim. Because the plaintiff was uncooper-
ative, and had to be restrian, until SGT. Nunez arrived. (Def's Memorandum
p. 9). The plaintiff was told by C.O. Reyes, to place his hands on the
wall, and the plaintiff complied with the direct order. (Plaintiff Decl.,
(2018) p. 169, 173, 176,). So if the plaintiff is complying with the
direct order, by placing his hands on the wall (Standard practice), not
only did it show the plaintiff being cooperative, but it also show the
plaintiff given himself up, not a threat to anyone, assuming the plaintiff
appeared to be a threat, and nowo order is being retored, assuming the
plaintiff was created a disturbance. Sotherefore, there purpose, or legit
reason, by the defendants' giving a direct order for the plaintiff to put
his "nose on the wall," otherthan to degrade, humiliate, and embarass the
plaintiff. It served no purpose, because I was defenseless and neutralize.
To prevail on an excessive force claim, a

12.

plaintiff first must show that the alleged use of force is "objectively sufficiently serious or harmful enough" to be actionable. Walsh, 194 F.3d at 50, (citing Hudson, 503 U.S. at 8). The inmate must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." Crawford, 796 F.3d at 256, (quoting McMillian, 503 U.S. at 8, 20, 112 S.Ct. 995). But "certain actions, including the malicious use of force to cause harm, Constitute Eighth Amendment violation per se. This result follows because when prison officials maliciously and sadistically use force to cause harm, comtemporary standards of decency are always violated." Blyden, 186 F.3d at 263. The use of excessive physical force against a prisoner may constitute cruel and unusual punishment even though the inmate does not suffer serious injury, Hudson v McMillian, 503 U.S. 1 (1992), Pp. 998-1002. If plaintiff can demonstrate that the amount of force used is more than de minimis, or otherwise involves force "repugnant to the conscience of mankind." Walsh, 194 F.3d at 48, (citing Hudson, 503 U.S. at 9-10).

Here the plaintiff did suffered an injury due to the excessive force that was applied by the defendant's an injury to the plaintiffs' right arm of the elbow, that did require surgery (Def's Ex. 3, DEFS 00074). The fact of the matter is, when the plaintiff was given a direct order to put his hands on the wall, the plaintiff complied, (plaintiff depo. p. 169,173, 176). In proper formation the plaintiff's legs, was spread apart, along with his arms, spreaded apart, standard police practice when an inmate is being frisk. The defendants' wanted the plaintiff hands on the wall, along with the plaintiff's nose touching the wall at the same time. And when the plaintiff refused, the embarassing order, the defendants' use of force is wanton and unnecessary, and was not applied in a good-faith effort to maintain or restore dicipline, but was use maliciously and sadistically use force, to cause

13.

to cause harm. Such standards always are violated when prison officials maliciously and sadistically use force to cause harm, See Whitley, 475 U.S. at 327, 106, S.Ct. at 1088. Since under the Whitley approach, the extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary, 475 U.S., at 321, 106 S.Ct. at 1085, (the absence of serious injury is relevant to, but does not end, the Eight Amendment inquiry). The "Objective Component" of Eighth Amendment analysis: Whether the alleged wrongdoing is objectively "harmful enough" to established a Constitutinal violation, id., at 303, 111 S.Ct. at 2336. Whether force was applied in a good-faith effort to maintain or restore *2 discipline, or maliciously and sadistically to cause harm. Extending Whitley's application of the "unnecessary and wanton infliction of pain" standard to all allegations of force, whether the prison disturbance is a riot or a lesser disruption, works, no innovation, See e.g., Johnson v Glick, 481 F.2d 1028. Whenever prison officials stand accused of using excessive physical force constituting "unnecessary and wanton infliction of pain" violative of the cruel and unusual punishment clause, the core judicial inquiry is that set out in Whitley v Albers, 475 U.S. 312, 320-321, (1986).

POINT II

THE PLAINTIFF SUFFERED A SERIOUS INJURY AND THE MEDICAL RECORDS SHOWS EVIDENCE OF THAT DESPITE THE DEFENDANTS CLAIMS FROM THEIR MEDICAL DOCTORS

Fed.R.Evid. 702 that the witness to testify is properly qualified as an expert to testify on matters that are scientific, techinical, or specialized in nature, see Hodder v United States, 328 F.Supp.2d 335 (2004), andsecond, the trial Court must determine that the expert's testimony will assist the trier of fact in understanding the evidence,

or determining an issue of facts.  See Campbell ex rex. Campbell v Metro,

Prop. & Cas. Ins. Co., 239 F.3d 179, (2d Cir. 2001).  Consistenly with

Kumho, the Rule as amended that all types of expert testimony present

questions of admissibility for the trial court in deciding whether the

evidence is reliable and helpful. Consequently, the admissibility of all

expert testimony is governed by the principle of Rule 104(a).  Under

that Rule, the proponent has the burden of establishing that the perti-

nent admissiability requirements are met by a preponderence of evidence.

See Bourjaily v United States, 483 U.S. 171, (1987).

The level of intellectual rigor that characterizes the practice of an

expert in the relevant feild (Kumho Tire Co. v Carmichael, 526 U.S. 137,

(1999)).  Accordingly, the Federal Rules of Evidence permit the admission

of expert testimony only "if (1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles

and methods, and (3) the witness has applied the principles and methods

reliably to the facts of the case.  while the proponent of expert testi-

mony has the burden of establishing by a preponderence of the evidence

that the admissibility requirements of Rule 702 are sasitisfied, see

Daubert, 509 U.S. at 593, (1993).

Here, the defendants' doctors both have claim that the plaintiffs' injury

is elbow condition, cubital tunnel syndrome, could not have resulted

from the alleged October 8, 2015, incident.  (Dr. Weinstein Decl., ¶7;

Dr. Macelaru Decl, ¶4).  And the way the plaintiff describes the arm

lifted behind his back, it would have damaged the shoulder, ligaments,

torn tissue and/ or fractured bone (Dr. Weinstein Decl., ¶4 and Ex. 1

p. 6; Dr. Macelaru Decl., ¶3).

15.

Also, PA Guzman's who has claim to not only examine the plaintiff's arm,
but also the shoulder, and no evidence revealed no physical damage to
the bone, tendons, or tissue in the plaintiff's arm; and she gave the
plaintiff a single dose of Tynenol. (PA Guzman Decl., ¶¶2-3).
Again, PA Guzman did not check the plaintiff's shoulder, or check to see
if there was damage to the "bone" tendons, or tissue. The plaintiff is
not a doctor of sorts, but one have to assume, in order to see if their
was damage to the bone, tendons, and tissue, you would have to run test
and use an x-ray machine to see if if there is some kind of bone damage,
ripped tendons, and tissue damage, inside internally. PA Guzman only
rubbed the plaintiff right elbow, she did not perform a thorough exami-
nation of the plaintiff arm. So it is physically impossible for PA Guzman
by looking at the plaintiff's right arm and can see there was no bone,
tendons, and tissue damage, without no x-ray test, just an eye test.
Secondly, both Dr. Weinstein, and Dr. Macelaru, have concluded that the
plaintiff suffers from a mild cubital tunnel syndrome, cause by sleeping
on the arm, repetively flexing, and extending the arm, or just by simply
using a phone. (Dr. Weinstein Decl., ¶7; Dr. Macelaru Decl., ¶4).
And the injury the plaintiff suffered was not due to the attack, of ex-
cessive force at the hands of the defendant's but the pain was caused by
a mild cubital tunnel syndrome. If that is the case, does a mild cubital
tunnel syndrome requires surgery. Because Dr. Macelaru performed surgery
on May 1, 2017, a procedure called a right cubital tunnel release caused
by compression (pinching) of the ulnar nerve at the elbow. (Dr. Macelaru
Decl., ¶4; Def's Ex. 3/DEFS 00074). However, the Unlar nerve, when
pinched is a type of injury or damage to one nerve or a group of nerves
resulting from constriction, compression, or streching of the nerve or
nerves;

16.

may be mild and temporary or may lead to more lasting or debilitating conditions (eg. peripheral neuropathy, carpal tunnel syndrome, tennis elbow); symtoms range from a "pins-and-needles" and "fallen asleep" sensation to burning sensations, nubness, and/or pain radiating from the area. " (American jurisprudence Proof of Facts 3d series 2018 Supplement Attorney's illustrated Medical Dictionary p. 126).

Here are the facts, the plaintiff does not sleep on his arms, the plaintiff is much comfortable sleeping on his back. The plaintiff does not parttake in any sport activities such as: Boxing, basketball, football, wrestling, weight lifting, (Plaintiff Depo., p. 58-61 (2018)).

The plaintiff does use a phone to call home, and has used a telephone, and a cellphone, when he was out and about in society. However, their has never been any complaints from the plaintiff of using these electronic devices, nor has the plaintiff made any complaints about pain of the right elbow, until the day of the incident on October 8, 2015.

Even assuming that the plaintiff did suffer from a cubital tunnel syndrome, due to using a phone, picking up heavy college books, handbags, or grocery bags, etc. The scientific question is, did the defendants' caused extensive injury by twisting the right arm and lifting up the arm where the ulnar nerve became more damaged, and the pain was so intense where as the plaintiff was required surgery to release the compression of the nerve, due to the defendants' excessive force of twisting the arm of the plaintiff. And it should be noted, the plaintiff has made complaints of nubness in his pinky and ring figer of the right hand, also the plaintiff did receive a corizone shot for pain before pre surgery, and this was all because the defendants' twisted the arm of the plaintiff awkardly, with inten to cause harm (See Plaintiff Depo.,p. 126-130 p. 134, plaintiff Ex. 5; Def's Ex. 3/DEFS 00019).

Sotherefore, the expert opinion of Dr. Weinstein and Dr. Macelaru could be contradicted by the facts, because in the medical dictionary a ulnar nerve can be caused by streching, i.e., pulling a person arm, or twisting someone arm, and lifting that person arm up, can possible cause a pinched nerve, or injury cause damage to a nerve or nerves resulting from constric-tion, compression, or streching of the nerve or nerves. In Dr. Macelaru own analysis, Dr. macelaru acknowledges, when he performed the surgery on the plaintiff, "the nerve was pretty compresses." (See Def's Ex. 3/DEFS 0074). Again, there is no record on file where the plaintiff had made complaints of any pain in the right elbow, during the course of his entire life, otherthan when the incident on October 8, 2015.

So did the defendants' aggrevated the injury more, assuming the nerve was already damage, or did the defendants' caused the injury by twisting and streching the plaintiff right arm that pinched the ulnar nerves that cause damage where the plaintiff was required surgery on May 1, 2017. "[T]hought the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as suggest bad faith.'" (254 F.Supp.2d 346, (S.D.N.Y. 2003), (quoting Boucher v U.S. Suzuki Motor Corp., 73 F.3d 18 (2d Cir. 1996)). Where expert testimony is connected to exsisting data only by ipse dixit of the expert, the Court may determine that there is an insufficient analytical connection between the opinion offered and supporting facts warrant admission of the expert's opinion. Gen.Elec. Co. v Joiner, 522 U.S. 136, (1997). Finally, it is important to note that "[t]he proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the Daubert framework by a pre-pon-derence of the evidence standard." Hallman v Taser*244 Int'l. Inc.,

928 F.Supp.2d 657 (E.D.N.Y. 2013). ("Essentially asking [the Court] to gate-keep expert testimony from [itself]"). Thus, "unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value," a Court may freely receive the evidence and disregard it later if it fails to satisfy the strictures of Rule 702 and Daubert 720 Lex acquisi-tion LLC, 2014 WL 4184691, at 10.


POINT III

DEFENDANTS SHOULD NOT BE ENTITLED TO QUALIFIED IMMUNITY


Qualified immunity protects government officials from civil liability when performing discreationary duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reason-able person would have known." Harlow v Fitzgerald, 457 U.S. 800, 818, (1982). In deciding whether qualified immunity applies, the treshold inquiry is whether the plaintiff's version of the facts "show[s] the of-fi-cer's conduct violated a constitutional right." Saucier v Katz, 533 U.S. 194-201, (2001). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v Briggs, 475 U.S. 335,341 (1986). "The issues on qualified immunity are: (1) Whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established; whether it was 'Objectively reasonable' for the conduct at issue was lawful." Gonzalez v City of schenectady, 728 F.3d 149,154 (2d Cir. 2013). (quoting Taravella v Town of Wilcott, 599 F.3d 129, 133-34 (2d Cir. 2019). The Courts in the Southern District has held, in Girbes-Pierce v City of New York, 2019 WL 1522631, the police officer was denied qualified immunity because the excessive force was established unreasonable

use of force. Where as, the plaintiff Girbes-Pierce, was handcuff and restained, not resisting arrest, when the officer pepper spray the plaintiff in the face.

Here, the plaintiff share some similarity's to Girbes-Pierce case, in the regard of not resisting. Because again the plaintiff gave himself up by placing his hands on the wall, as instructed by the defendants' (plaintiff Depo., (20180 p. 169, 173, 176,). Moreover, the plaintiff is cooperating with the defendants' direct order, and is not resisting, the plaintiff is subdued and offering no further active resistance; when the plaintiff put his hands on the wall. When the defendants' gave a direct order for the plaintiff to put his nose on the wall, (Plaintiff Depo., (2018) p. 171, 173, 176,). It wasn't for the sole purpose to restore order; nor was the direct order given to protect their safety, or that they felt threaten by the plaintiff, because the plaintiff hands was on the wall, and C.O. Reyes, frisk the plaintiff for weapons of contraband, and there were two officer's against one inmate, so the odds were in their favor. Plus, there were an additional four C.O. if needed for back up. Sotherefore, it was unnecessary to have the plaintiff to put his nose on the wall, whereas, the plaintiff is being cooperative, and comply with direct order to place his hands on the wall. The use of force was unreasonable because the plaintiff was not resisting arrest, the plaintiff gave himself up in compliance with the defendants' direct order to place his hands on the wall. It was when the plaintiff told the defendants' "I'm not doing that," putting the nose on the wall, (Plaintiff Depo., p. 176 ¶3-5). The use of force was applied in bad-faith. Therefore, the defendants' constitutes a clearly established unreasonable use of force. (Citing **Tracy**, 623 F.3d at 98); **Jackson v Tellado**, 236 F.Supp.3d 636, 669 (E.D.N.Y.)2017); any additional use of force was plainly unnecessary and thus violated clearly established law.

21.

(Collecting cases); Toliver v New York City Dep't of Corr., 202 F.Supp.3d 328, 338 (S.D.N.Y. 2016); See e.g., Knight v City of New York, NO. 16-CV-7888 2019, WL 95480 at *5 (S.D.N.Y. 2019)).

"When a defendant invokes qualified immunity, Courts consider whether the plaintiff has shown'(1) that the [defendant] violated a statutory or Constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Muschette, 910 F.3d at 69. Here, the plaintiff was being cooperative and not the aggressor, or posed a real threat to anyone, nor was the plaintiff created a disturbance. When the defendants' excorted the plaintiff outside the visit room, the defendants' order the plaintiff to put his hands on the wall, and the plaintiff complied. The plaintiff is not resisting, he is subdued, defense-less, cooperating, and is no eminent threat to anyone, nor the defendants. The defendants' wanted the plaintiff noses, and his hands touching the wall simeoustansly at the same time, and when the plaintiff refuse. The defendants' grab the right arm of the plaintiff began twisting the arm, and then pined the arm against the plaintiff's body, and proceeded to lift up the right arm, with maliciously and sadistically to cause harm. In Violation of constitutional established law; violating the VII Amend. Const. of cruel and unusual puinshment. There was no need for the use of force by the defendants. Because the the plaintiff had his hands on the wall, in compliance with the direct order. The plaintiff was not being aggressive, threatening, or verbally abusive towrds the defendants' where the plaintiff is being cooperating with the direct order. The defendants should not be granted qualified immunity, because the plaintiff was not refusing a direct order when the plaintiff put his hands on the wall, giving himelf up. The plaintiff was not resisting, in contrast, the plaintiff is being compliant by placing his hands on the wall.

The defendants' argument is that the plaintiff was an uncooperative, and that pulling the arm behind the back for less than a minute, restraining the plaintiff until assistance arrived, does not amount to excessive force. (Def's Memorandum p. 16). The defendants' also argue that they are entitled to qualified immunity because at a bare minimum, have believed that he was not violating the plaintiff's constitutional rights after the plaintiff became agited in front of 20 other inmates, was verbally abusive and refused a direct order. (Def's Memorandum p. 17). Again, there were approx. three, or four more officer's inside of the visit room # 2 on the day of questioning. If the plaintiff was verbally abusive, and became agited in front of 20 other inmates. One of the officer's inside the visit room, if not all of them, would've surrounded the plaintiff, or came to the aid of their fellow C.O., and it should be noted, there is no sworn declaration from the other officer's that back up C.O. Reyes claims, of what took place inside the visit room # 2. Nor is there a sworn declaration from the defendant C.O. Shawn Thoben, that back up these claims of the defendants' chain of events. Also, C.O. Thoben has a history of harrassing inmate Billy Andre, and his family members, when Mr. Andre family came to visit him at DownState C.F., on and about March, or April, 2017. Furthermore, if the plaintiff put his hands on the wall, means the plaintiff is cooperative, and complying to the defendants' direct order. Had the plaintiff not put his hands on the wall, as directed, then the defendants would have a legit argument. However, the defendants' use of force was unreasonable, and unnecessary, because the plaintiff put his hands on the wall, and spreaded his legs, and was frisk, Correctional officer standard practice, of procedure. And if the defendants felt threaten, by the plaintiff, then why didn't the defendants' or any other officer put handcuff restaint on the plaintiff. The plaintiff was never handcuff, even when SGT. Nunez

arrived, and after the plaintiff was excorted back to the blocks. (Plain-
tiff Depo., (2018) p. 169 ¶4, p. 190 ¶6-19). Moreover, the defendnats'
was fully aware of their conduct, because if they gave the plaintiff an
direct order to put his hands on the wall, and the plaintiff does it, then
the plaintiff is following orders. Therefore, the defendants' should not
be entitled to qualified immunity, for they abused their power of authority.
By ordering the plaintiff to put his nose on the wall, whereas, the plain-
tiff gave himself up, and was neutrilized, and not resisting by putting
his hands on the wall, and the defendants' use of force was unnecessary.

CONCLUSION

## CONCLUSION

For the reason set forth above, Plaintiff respectfully request that the
Defendants motion for summary judgment be denied.

Dated: New York, New York
       October 27, 2019

                                        Respectfully submitted,

                                        *Raymond Jackson*
                                        Raymond Jackson # 15A3740
                                        [Pro Se] Plaintiff
                                        Sing Sing C.F.
                                        354 hunter St.,
                                        Ossining, New York 10562