UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED:  12/22/2020         │
└─────────────────────────────────┘
```

RAYMOND JACKSON,

        Plaintiff

     v.

DOWNSTATE CORRECTIONAL FACILITY,
S. REYES (C.O.), and C.O. THOBAN,

        Defendants.

16-CV-267 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    *Pro se* Plaintiff Raymond Jackson ("Plaintiff") commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Corrections Officers ("C.O.s") Reyes ("Defendant Reyes") and Thoban ("Defendant Thoban") (collectively, the "Defendants"), and Downstate Correctional Facility ("Downstate")[1] for alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment during an incident that occurred on October 8, 2015. (*See* Second Amended Complaint ("SAC") (ECF No. 22).). Presently before the Court is Defendants' motion for summary judgment. (ECF No. 70.) For the reasons that follow, the Court DENIES Defendants' motion for summary judgment.

---

[1] By order dated February 2, 2016, this Court dismissed all claims against Downstate and terminated it from the action, as it is not a proper party. (ECF No. 8.)

# BACKGROUND[2]

Plaintiff's claims arise from an incident that occurred on October 8, 2015 while he was incarcerated at Downstate. (SAC at 4.) The day after the incident, he was transferred to Clinton Correctional Facility ("Clinton"). In December 2018 Plaintiff was transferred to Sing Sing Correctional Facility, where he remains. (Transcript of December 17, 2018 Deposition of Plaintiff Raymond Jackson ("Plf.'s Dep. Tr.") at 14 (ECF Nos. 74-3 and 82-1).)

## I.        The October 8, 2015 Incident

### A.        *Plaintiff's Account*

Plaintiff attests that on the evening of October 8, 2015 he was inside visiting room # 2 at Downstate where his property was being packed in preparation for a transfer to a different facility. (Plaintiff's Declaration ("Plf.'s Decl.") at ¶ 4 (ECF No. 80); Plf.'s Dep. Tr. at 108-09, 112, 149) Defendants Reyes and Thoban were assigned to review Plaintiff's property and Defendant Thoban was having difficulty untying the knot in a shoestring that was tied around Plaintiff's property bag so Defendant Reyes directed Plaintiff to untie the knot. (Plf.'s Dep. Tr. at 112, 155-58; Plf.'s Decl. at ¶ 5.) Plaintiff tried to assist with the knot but Defendant Thoban said "I got it." (Plf.'s Dep. Tr. at 108, 158-59.) Plaintiff then told Defendant Reyes "he got it." (Plf.'s Decl. at ¶¶ 5-6.) In response, Defendant Reyes said something about how he did not like Plaintiff's response and then threatened

---

[2] Defendants filed a statement pursuant to Rule 56.1 (ECF No. 78) and served Plaintiff with a Notice to *Pro Se* Litigants Who Opposes a Motion For Summary Judgment and a copy of Federal Rule of Civil Procedure 56 (ECF No. 79). Plaintiff's statement of facts in opposition is not numbered to correspond to Defendants' statement of facts. Despite this failing of pro se Plaintiff's purported Rule 56.1 statement, "it is well settled that a pro se's papers are to be read liberally," and the Court does so in consideration of Plaintiff's opposition to the instant motion. *See Olle v. Columbia Univ.*, 332 F.Supp.2d 599, 603 (S.D.N.Y. 2004) (considering those facts contained in pro se plaintiff's opposition to summary judgment that were based on personal knowledge or otherwise admissible evidence, despite plaintiff's failure to submit a Local Civil Rule 56.1 statement.).

that Plaintiff's legal papers would not get packed and would go missing and that they would not be responsible. (Plf.'s Dep. Tr. at 159-60; Plf.'s Decl. at ¶¶ 6-7.) Plaintiff admitted to responding to the effect of "I'll grieve your ass" (Plf.'s Decl. at ¶¶ 7-8) and "Don't fuck with my legal work" (Plf.'s Dep. Tr. at 159-63). Plaintiff testified that Defendant Reyes "was getting upset, huffing and puffing" (Plf.'s Decl. at 159), but maintains that Plaintiff "was not agitated, or waving his arms around. Had [he] done so, the other C.O. would've had done [sic] something to say about it. given that visit room # 2 is a small area." (Plf.'s Decl. at ¶ 9); Plf.'s Dep. Tr. at 162, 165). He also testified that there were over 10 other inmates and at least three or four corrections officers other than Defendants in visit room #2. (Plf.'s Dep. Tr. at 148, 153.)

Defendant Reyes asked Plaintiff to step into the hallway and to put his hands on the wall, which Plaintiff did. (Plf.'s Decl. at ¶ 10.) However, when Defendant Thoban ordered Plaintiff to put his nose against the wall when his hands were already on the wall, Plaintiff refused. (*Id.* at ¶¶ 11-13; Plf.'s Dep. Tr. at 171, 179-80.) Plaintiff claims that "there were no legitimate reason whatsoever, by the defendants' damanding [sic] the plaintiff to put his nose on the wall otherthan [sic] to humiliate, and embarrasses the plaintiff, where as, the plaintiff was being compliant by placing his hands on the wall." (Plf.'s Opp'n Mem. at 3; *see also id.* at 12, 13, 21; Plf.'s Decl. at ¶ 12; Plf.'s Dep. Tr. at 175.) At that point, Defendant Reyes grabbed Plaintiff's right arm and twisted it behind Plaintiff's back, with help from Defendant Thoban, pinning the arm against Plaintiff's body and lifting it up so Plaintiff "was on his tip-toes screaming in pain." (*Id.* at ¶ 14; Plf.'s Dep. Tr. at 175, 180-83.) Defendants Reyes and Thoban had Plaintiffs arm lifted up "for 30 seconds or more" but kept it pinned behind Plaintiff's back for about two minutes until Sergeant Nunes, who Defendant Reyes had called for over the walkie talkie, arrived. (*Id.*; Plf.'s Dep. Tr. at 171, 173, 177, 179-81, 183-84.) Plaintiff claims that when Sergeant Nunez arrived she saw

3

Plaintiff's arm being twisted and told Defendant Reyes to let go of Plaintiff. (Plf.'s Dep. Tr. at 184-85, 205; Plf.'s Opp'n Mem. at 3 (ECF No. 82).) Plaintiff also claims that he told Sergeant Nunez that Defendants hurt him and asked for medical treatment. (Plf.'s Decl. at ¶ 15; Plf.'s Dep. Tr. at 199.) Plaintiff maintains that he was not put in restraints during or after the incident and was escorted back to the housing unit by another officer and told he would get medical treatment in the morning. (Plf.'s Decl. at ¶ 15.)

On the morning of October 9, 2015, Plaintiff told Sergeant Stevens about the incident that occurred the prior evening. (*Id.* at ¶ 16.) Sergeant Stevens took photos of Plaintiff's injury, took a statement from Plaintiff, and took Plaintiff to the clinic.[3] (*Id.*)

### B.    Defendants' Account

Defendant Reyes attests that on the evening of October 8, 2015, he and Defendant Thoban were inspecting the property of inmates scheduled for transfer to another facility the following day. (Reyes Decl. ¶¶ 2-3.) He attests that at the time Plaintiff came to their table, there were about 20 other inmates in visit room #2 (*id.* ¶ 3), and that "[a]s CO Thoban began unpacking Plaintiff's property bag, Plaintiff became agitated, waving his arms around and yelling, 'Don't f***k with my legal papers,' and threatening to 'grieve my ass' if his papers were mishandled." (*Id.* at ¶ 4.) Defendant Reyes attests

> I gave Plaintiff several direct orders to "put his hands behind his back and stop yelling." Plaintiff did not comply. I then ordered Plaintiff to place his hands behind his back and walk up to the wall just outside Visiting Room #2. Plaintiff was removed from Visiting Room 2 to insure [sic] that his conduct did not incite the other inmates. Plaintiff was led out by CO Thoban and myself.

---

[3] Plaintiff attests that he has repeatedly asked Defendants to produce the photographs Sgt. Stevens took and the statement Plaintiff made to him. (Ex. 2 to Plf.'s Decl.) Defendants produced an email exchange between Sergeant Stevens and Defendants' counsel dated November 5, 2018 in which Sgt. Stevens stated "I don't really remember anything about the incident. I did sign the report . . . . Officer Reyes probably asked me to sign the misbehavior because his supervisor was unavailable at the time." (Ex. 1 to Plf.'s Decl.)

4

Upon exiting Visiting Room #2, I radioed the supervising sergeant, Evelyn Nunez ("Sgt. Nunez"), asking that she to report to the area because an inmate was creating a disturbance. Sgt. Nunez arrived at the area within a minute or so, at which point she directed Correction Officer Nicholas Cicala to place Plaintiff in mechanical restraints (handcuffs), and directed Correction Officer Luis Peguero to escort Plaintiff back to his cell. Plaintiff was returned to his cell without incident. No physical force was used on Plaintiff.

(*Id.* at ¶¶ 5-6; *accord* Ex. 1 to Reyes Decl. (ECF No. 72-1).)

Sergeant Nunez attests:

. . . Officer Sergio Reyes contacted me by walkie-talkie, asking that I report to Visiting Room #2 because of an inmate disturbance. I reported to the area within a minute or two of being called. When I arrived, Officers Reyes, Shawn Thoban, and Nicholas Cicala were standing outside of the inspection room with [Plaintiff]. [Plaintiff] was standing facing the wall with his hands behind his back. Officer Reyes asked to have [Plaintiff] placed in handcuffs because he had been disruptive while his property was being inspected. I gave a pair of handcuffs to Officer Cicala who placed them on [Plaintiff].

Officer Reyes updated me on what had occurred. He and Officer Thoban had been checking [Plaintiff's] personal belongings for contraband. As Officer Thoban began removing [Plaintiff's] legal work from his property bag, [Plaintiff] yelled at Officer Thoban to watch how he handled his legal work. Officer Reyes ordered [Plaintiff] to quiet down. When [Plaintiff] continued to loudly object to the manner in which his legal mail was being handled, Officer Reyes again ordered him to be quiet and cooperate with the pack up. When [Plainitff] refused to do so, Officer Reyes escorted him out of the Visiting Room and radioed me.

[Plaintiff] told me that he just wanted his legal work packed and sent with him on the draft. I informed him that he was going to be escorted back to his block and that his property was going to be packed without him being present. He stated he was fine with that as long as his legal work was packed. I assured him that all of his property, including his legal work, was going to be packed. I then ordered Officer Luis Peguero to escort Plaintiff back to his cell. At no time did we use any force on [Plaintiff] and he did not tell me that force had been used on him.

(Nunez Decl. ¶¶ 3-5 (ECF No. 85); *accord* Ex. 1 to Nunez Decl. (ECF No. 85-1).)

On October 9, 2015 Defendant Reyes submitted a memorandum to Sergeant Nunez regarding the accident, which aligns with the account Defendant Reyes provided in his declaration. (Ex. 1 to Reyes Decl. (ECF No. 72-1).) In addition, Defendant Reyes noted in the memorandum "at no time did I discuss anything of a personal nature with [Plaintiff]." (*Id.*) Sergeant Nunez also

prepared a memorandum that day for the lieutenant, which aligns with the account Sergeant Nunez provided in her declaration. (Ex. 1 to Nunez Decl. (ECF No. 85-1).)

A misbehavior report regarding the incident on October 8, 2015, was issued, prepared by Defendant Reyes, in which Plaintiff was charged with creating a disturbance, interference with an employee, and refusing a direct order and indicating that no force was used. (Ex. 2 to Reyes Decl. (ECF No. 72-2); Ex. 2 to Turkle Decl. (ECF No. 74-2); *see* Plf.'s Dep. Tr. at 196.) On October 16, 2015, a hearing Officer issued a decision that Plaintiff was guilty of creating a disturbance and interfering with an employee but not guilty of refusing a direct order. (ECF No. 74-2; *see* Plf.'s Dep. Tr. at 196.)

Defendants did not provide statements or reports from Defendant Thoban or any other witnesses to or participants in the incident.

## II.    Plaintiff's Injury

### A.    *Plaintiff's Description*

Plaintiff maintains that prior to the incident, he had never had pain in or complaints about his right elbow. (Plf.'s Dep. Tr. at 193.) Plaintiff claims that as a result of the incident, he sustained serious injury to his right elbow, requiring surgery, which Dr. Marcelaru performed on May 1, 2017.[4] In support of his claim that his elbow injury resulted from the incident, he submitted sick call request forms from December 5, 2015, January 25, 2016, and May 8, 2016 complaining of pain in his elbow. (Ex. 5 to Plf.'s Decl.) He submitted additional sick call request forms following eight weeks of physical therapy indicating that as of June 16, 2016 and October 3, 2016 he

---

[4] Plaintiff also testified that Dr. Marcelaru gave him at least one cortisone shot, which did not help with the pain in his elbow. (Plf.'s Dep. Tr. at 127; *see* Dr. Weinstein Rpt. at 2.)

continued to have "severe pain" and wanted to see a doctor as well as an October 25, 2016 note indicating the same. (*Id.*)

Plaintiff contends that Physician Assistant Guzman, who saw him in the clinic the morning after the incident "did not thoroughly examine" his elbow or right arm, and only rubbed the bottom of Plaintiff's elbow, gave him Tylenol and told him to seek medical treatment at his new facility. (Plf.'s Decl. at ¶ 21.)

Plaintiff contends that the notes from Defendants' expert Dr. Weinstein from their "five-minute" appointment on March 19, 2019 are incomplete because Plaintiff told Dr. Weinstein about numbness and pain in his elbow and the report does not reflect that. (*Id.* at ¶ 22.) Plaintiff also attests that he told Dr. Marcelaru that his elbow was injured during the incident on October 8, 2015 and Dr. Marcelaru did not suggest any other cause. (Plf.'s Dep. Tr. at 126.)

In support of his claim that the October 8, 2105 incident caused his injury, Plaintiff cites the Attorney's Illustrated Medical Dictionary:

> The Unlar [sic] nerve, when pinched is a type of injury or damage to one nerve of a group of nerves resulting from constriction, compression, or stretching of the nerve or nerves; may be mild and temporary or may lead to more lasting or debilitating conditions (e.g. peripheral neuropathy, carpal tunnel syndrome, tennis elbow); symptoms range from a "pins-and-needles" and "fallen asleep" sensation to burning sensations, numbness, and/or pain radiating from the area.

(Plf.'s Opp'n Mem at 16-17.) Plaintiff further contends that he does not sleep on his arm, he is "much more comfortable sleeping on his back." (*Id.* at 17.)

### B.    *Defendants' Description*

Defendants submitted medical evidence that they claim contradicts Plaintiff's description of how he injured his right elbow.

Defendants submitted various pages of Plaintiff's medical records. (Ex. 3 to Turkle Decl. (ECF No. 74-3).) These records include notes from Plaintiff's Downstate clinic visit on October

9, 2015 as well as notes from clinic visits at Clinton October 10 and 19, 2015 and December 7, 21, and 28, 2015 and generally indicate complaints of pain to the right elbow, noting Plaintiff's belief that the injury resulted from the October 2015 incident. A note from December 28, 2015 reports that an x-ray taken that day found a small olecranon spur. (*Id.* at 6.) Plaintiff was referred for physical therapy March 24, 2016 for "pain and weakness" in his elbow since October 2015, which is referred to as "tennis elbow." (*Id.* at 10.) On January 31, 2017 Plaintiff had an EMG nerve test, which found "Mild, right Ulnar neuropathy in the vicinity of the medial epicondyle." (*Id.* at 12-16.) A consultation report from the same date also indicates "possible carpal tunnel syndrome." (*Id.* at 17.) An orthopedic consultation on March 24, 2017 suggested that Plaintiff had right cubital tunnel decompression and recommended referral for physical therapy. (*Id.* at 18-20.) On May 1, 2017 Dr. Marcelaru performed cubital tunnel release/ulnar nerve decompression surgery on Plaintiff's right elbow. (*Id.* at 29-44.) Following the procedure, Plaintiff had two sessions of physical therapy per week through at least June 2017. (*Id.* at 45-55.)

Physician Assistant Guzman ("PA Guzman"), who examined Plaintiff in the Downstate infirmary on the morning of October 9, 2015 attests that he

> performed a thorough physical examination of Plaintiff and found no evidence of his having sustained an injury consistent with bis report of an alleged assault by an officer the prior evening . . . .
>
> As for Plaintiffs particular complaint of arm pain, I found Plaintiffs range of motion intact for his right shoulder, right elbow, and right wrist. There was were [sic] no deficits to his pulse, *i.e.,* no evidence of gross physical damage to the bone, muscles, or tissues in his right arm, initially; no bony tenderness (he did not complain of pain when his arm, shoulder and elbow were palpated); no swelling; no suspicion of fracture; no bruising; and no signs or symptoms of cellulitis (infection). I prescribed Plaintiff 975 mg. of Tylenol "now," which meant that the prescription was limited to that single dose. I did not recommend that Plaintiff be seen by a medical doctor, or refer him to an outside medical consultant. My physical examination did not reveal any evidence of injury consistent with his report of having had his arm pulled behind his back.

(Guzman Decl. ¶¶ 3-4 (ECF No. 77).). PA Guzman submitted his notes from the exam as an exhibit to his declaration. While these notes are difficult to decipher, they seem to align with the declaration. (*See* Ex. 1 to Guzman Decl. (ECF No. 77-1); *see also* Ex. 3 to Turkle Decl. at 2 (ECF No. 74-3).)

Dr. Marcelaru, who first examined Plaintiff in 2017 for right elbow pain, which Plaintiff contends resulted from the October 8, 2015 incident, attests

> [Plaintiff's] elbow pain was not the result of his arm having been pulled behind his back in the manner he describes. If [Plaintiff's] arm had been pulled in this manner, the resulting stress would be to his shoulder, not his elbow, and he likely would have dislocated his shoulder, or suffered damage to the ligaments in his arm and shoulder. There is no medical evidence that [Plaintiff] sustained injuries to his arm, shoulder, or forearm, and he complained of no such injuries to me. It is inconceivable to me that [Plaintiff] had his arm manipulated as he contends, yet he complains only of right elbow pain in isolation from any other injuries. Further, in my 17 years of practicing medicine, I have never treated a patient who suffered an elbow injury from having his arm twisted behind his back.
>
> On May 1, 2017, eighteen months after the October 8, 2015 incident, I performed a surgical procedure known as a right cubital tunnel release on [Plaintiff's] right elbow. Cubital tunnel syndrome is caused by compression (pinching) of the ulnar nerve at the elbow. Because the ulnar nerve passes close to the surface of the skin at the elbow, often referred to as the "funny bone," it is typically damaged by repeatedly leaning on the elbow, by bending the elbow for prolonged periods while sleeping or on the phone, or sometimes by abnormal bone growth in the area. Cubital tunnel syndrome is not caused by the pulling of an arm behind the back in the manner described by [Plaintiff].

(Dr. Marcelaru Decl. ¶¶ 3-4 (ECF No. 76).) Dr. Marcelaru further attests that a December 2015 x-ray of Plaintiff's right elbow "reflected a small olecranon spur . . . [which] typically take[s] years to grow [is] not a sign of an elbow injury, particularly an injury reportedly occurring only a few weeks before the x-ray was taken" and that the January 2017 electromyography, "which reflected a mild ulnar neuropathy in the vicinity of the medial epicondyle . . . the bony bump on the inside of the elbow . . . [which] is a very common condition that can develop by repetitively placing your

arm on a hard surface. I am unaware of, an instance in which the twisting of a person's arm resulted in this type of nerve damage." (*Id.* at ¶¶ 5-6.)

Dr. Weinstein, an expert retained by Defendants who examined Plaintiff on March 19, 2019 and provided a report dated March 27, 2019 ("Dr. Weinstein Rpt.") (ECF No. 75-1), attests that "if [Plaintiff's] arm had been raised behind his back as high as he describes, he would have damaged his shoulder, ligaments, tearing tissue and/or fracturing bone. The fact that the medical evidence shows that [Plaintiff] suffered none of these injuries demonstrates that his arm was not pulled back in the manner he describes." (Dr. Weinstein Decl. at ¶ 4; *see* Dr. Weinstein Rpt. At 6.) Dr. Weinstein further attests that Plaintiff's "confirmation that he did not sustain injuries to his shoulder, ligaments or tissue, reinforces [his] conclusion that [Plaintiff's] arm was not pulled behind his back in the way he contends" and that, given Plaintiff's physical characteristics as a "stocky individual, with a history of obesity, and not particularly limber or loose jointed . . . . it is highly unlikely, if not impossible that his arm was pulled high enough behind his back to allow his hand to touch his head. Had this occurred, I would have expected that [Plaintiff's] shoulder would have been dislocated, or related injuries to his shoulder and arm, and there were none." (Dr. Weinstein Decl. at ¶¶ 5-6; Dr. Weinstein Rpt. at 6.) Dr. Weinstein further noted that on May 1, 2017 Plaintiff had "surgery for cubital tunnel syndrome (a compression of the ulnar nerve) of his right elbow" and that "[c]ubital tunnel syndrome is not caused by having one's arm pulled behind his back. Cubital tunnel syndrome is a condition associated with repetitive flexing and extending the elbow, or direct pressure to the elbow such as sleeping on it, or from arthritis. I can say with virtual certainty that the reported pulling of [Plaintiff's] arm did not cause him to develop cubital tunnel syndrome." (Dr. Weinstein Decl. at ¶ 7; *see* Dr. Weinstein Rpt. at 6.)

### III.    Procedural History

Plaintiff filed this action on January 7, 2016. (ECF No. 1.) On March 21, 2016 Plaintiff sought permission to withdraw his complaint "because he has not used the proper vehicle in this matter." (ECF No. 9.) The Court granted Plaintiff's request and dismissed the matter without prejudice. (ECF No. 14.) On November 16, 2016 Plaintiff asked the Court to reinstate the case in light of the denial of his grievance regarding the October 8, 2015 incident. (ECF Nos. 15, 18.) The Court granted Plaintiff permission to file an amended complaint and directed the clerk to reopen this case. (ECF No. 19.) Plaintiff filed his amended complaint on February 16, 2017 (ECF No. 20), and filed his second amended complaint on March 13, 2017 (ECF No. 22).

On July 31, 2018 this Court issued an opinion and order denying Defendants' motion for summary judgment on the basis that Plaintiff failed to exhaust his administrative remedies (ECF No. 37) and directing the parties to engage in discovery (ECF No. 46). Discovery was completed on May 20, 2019.

Currently before the Court is Defendants motion for summary judgment. (ECF No. 70.) Plaintiff opposed the motion. ("Plf.'s Opp'n Mem.") (ECF No. 82).) Defendants also filed a reply. (ECF No. 84.)

### LEGAL STANDARDS

### I.    Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). At the summary judgment stage "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Hayes v. N.Y.C. Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

When a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted). "Nonetheless, proceeding pro se does

not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same). That said,

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Jeffreys*, 426 F.3d at 554 (quoting *Anderson,* 477 U.S. at 252).

## II.    Section 1983

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To maintain a Section 1983 claim, a plaintiff must establish two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his

constitutional rights or privileges. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir. 1998).

### III. Eighth Amendment Excessive Force Claims

"The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Id.* "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* at 268 (citation and some quotation marks omitted). "This inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). This subjective inquiry requires courts to examine "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir. 2003)).

"Second, [the prisoner] must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford*, 796 F.3d at 256 (quoting *Hudson*, 503 U.S. at 8). This objective inquiry is "context specific, turning upon contemporary standards of decency." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Blyden*, 186 F.3d at 263). That said, "courts in this district have not required that injuries caused by the alleged

excessive force be corroborated by medical records." *Rickett v. Orsino*, No. 10 CIV. 5152 CS PED, 2013 WL 1176059, at *15 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted*, No. 10-CV-5152 CS PED, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013) (quoting *Ninortey v. Shova,* No. 05 Civ. 542(SHS), 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citation and quotation marks omitted). However, "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir. 2009) (alteration and quotation marks omitted); *see Griffin v. Crippen*, 193 F.3d 89, 91-92 (2d Cir. 1999) (explaining that the fact that plaintiff "suffered only minor injuries" did not warrant dismissal). Nevertheless, "a de minimis use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

Summary judgment is inappropriate in "Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak" "where a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically." *Wright,* 554 F.3d at 269.

### IV.    Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official is entitled to qualified immunity unless (1) the facts alleged or shown by the plaintiff state a violation of a statutory or

constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The Supreme Court has directed that courts cannot "define clearly established law at a high level of generality," rather they must ask "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (internal citation omitted).

## DISCUSSION

### I.    Plaintiff's Use of Force Claim

Defendants assert that they are entitled to summary judgment because the amount of force Plaintiff contends that Defendants used was reasonable in light of his admitted disobedience and would not implicate the Eighth Amendment and that, even if pulling an uncooperative inmate's arm behind his back further than necessary did implicate the Constitution, medical evidence and affidavits from Defendant Reyes and Sergeant Nunez establish that this did not occur. Plaintiff maintains that Defendants used excessive force when they pulled Plaintiff's arm behind Plaintiffs back and lifted it when he was complying with their order to place his hands on the wall and was not otherwise threatening or resisting and further claims that summary judgment is inappropriate because Defendants have withheld critical information regarding the incident, specifically the photographs and statement from the morning after the incident that Sergeant Stevens took.

In other words, the parties dispute (1) whether Plaintiff was being disruptive, (2) whether Plaintiff refused to comply with a reasonable order, (3) whether force was used on Plaintiff at all, and (4) if force was used, whether it caused Plaintiff's elbow injury. Defendant Reyes disputes that he pulled Plaintiff's arm behind his back (Reyes Decl. at ¶ 6), and Sergeant Nunez claims that

when she arrived on the scene "Officers Reyes, Shawn Thoban, and Nicholas Cicala were standing outside of the inspection room with [Plaintiff.] [Plaintiff] was standing facing the wall with his hands behind his back." (Nunez Decl. at ¶ 3.) Sergeant Nunez does not mention whether any of the officers were in physical contact with Plaintiff when she arrived; however, she attests that "[a]t no time did we use any force on [Plaintiff] and he did not tell me that force had been used on him." (Nunez Decl. at ¶ 5.) Additionally, the declarations Defendant submitted from Plaintiff's treating physicians and Defendants' medical expert—from PA Guzman, who saw Plaintiff in the Downstate clinic the morning after the incident; Dr. Mercelaru who first examined Plaintiff in 2017 for right elbow pain and performed surgery on Plaintiff on May 1, 2017; and Dr. Weinstein, who provided an expert opinion—all opine that based on Plaintiff's physical condition, including his subsequent elbow rather than shoulder complaints, Plaintiff's arm was not pulled behind his back and lifted as Plaintiff claims.

In response, Plaintiff relies almost exclusively on his own testimony.[5] Plaintiff testified that he complied with all reasonable orders given to him by Defendants and that that while Plaintiff was standing with his hands against the wall, and therefore was not a threat to Defendants, Defendant Reyes grabbed Plaintiff's right arm and twisted it behind Plaintiff's back, and with Defendant Thoban pinned Plaintiff's arm against Plaintiff's body and lifting it "for 30 seconds or more" and keeping it pinned behind Plaintiff's back for about two minutes. (Plf.'s Decl. at ¶ 14; Plf.'s Dep. Tr. at 171, 173, 180-84.) Plaintiff contends that because his hands were on the wall, he

---

[5] Plaintiff also submitted an affidavit from a fellow inmate who had interactions with the same Defendants and filed a grievance against one of them. (ECF. No. 81.) The fellow inmate has no personal knowledge regarding the October 8, 2105 event; rather, he attempts to provide support for Plaintiff's claim that Defendants acted maliciously toward him based on the fellow inmate's belief that Defendants had acted similarly maliciously towards him.

was not a threat to Defendants and also if he was actually making a disturbance as claimed by Defendants, it would have drawn the attention of the nearby officers and inmates and they would have placed him in restraints, which Plaintiff claims they did not do. (Plf.'s Opp'n Mem. at 3; *see also id.* at 12, 13, 21; Plf.'s Decl. at ¶ 12; Plf.'s Dep. Tr. at 175.) In other words, Plaintiff claims that Defendants used force on him and that they did not use force in good faith because Plaintiff had complied with their direct orders by putting his hands on the wall and he was not being aggressive, threatening, or otherwise resisting. (Plf.'s Opp'n Mem. at 2.) Plaintiff's claim that he was not uncooperative is at least partially supported by the fact that the hearing officer who reviewed Plaintiff's misbehavior report found Plaintiff guilty of creating a disturbance and interfering with an employee but not guilty of refusing a direct order. (ECF No. 74-2; *see* Plf.'s Dep. Tr. at 196.)

Plaintiff further attests that prior to the incident he never had problems with his right elbow and that the injury to his elbow resulted from the incident. (Plf.'s Dep. Tr. at 193.) Plaintiff's belief that his right elbow injury resulted from the incident is memorialized in in the sick call request forms he submitted from 2015 and 2016 (Ex. 5 to Plf.'s Decl.) as well as the medical records Defendant submitted regarding Plaintiff's elbow pain. This evidence, though largely comprised of his own testimony, is "more than mere conclusory allegations subject to disregard; [it is] specific and detailed," and "made under penalty of perjury" and is therefore sufficient to raise a dispute of material fact. *Scott*, 344 F.3d at 291.

Even if a reasonable jury could find that Plaintiff's elbow injury did not result from the October 8, 2015 incident, it would not necessarily follow that Defendants did not use excessive force. The extent of an inmate's injuries as a result of the defendant's alleged conduct is not a factor in determining the objective component of an excessive use of force claim. *See Wilkins v.*

*Gaddy*, 559 U.S. 34, 37 (2010) (explaining that "core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).

At the summary judgment stage, the Court is precluded from "reconciling the conflicting versions of the incident" or from "viewing the evidence in favor of defendants," the moving party. *Randolph v. Griffin*, 816 F. App'x 520, 523, 525 n.3 (2d Cir. 2020) (holding that district court violated well-settled summary judgment standards "[b]y weighing the conflicting evidence" when it "determined that the record evidence of Randolph's injuries is more consistent with Defendants' version" (internal quotation marks omitted) and noting that "[e]ven assuming Randolph's evidence is less than compelling, the district court was not permitted to weigh the evidence and resolve the factual disputes"); *see also Adamson v. Miller,* 808 F. App'x 14, 17 (2d Cir. 2020) (vacating district court's order granting summary judgment on excessive force claim where plaintiff's "testimony, although not corroborated by other evidence, was not contradictory and incomplete, nor was it so replete with inconsistencies and improbabilities that no reasonable juror could credit it . . . . [rather, plaintiff] has consistently asserted for the past ten years that he was placed in a chokehold and punched").

Accordingly, Plaintiff has adduced sufficient evidence to raise a dispute of material fact as to whether Defendants used force on Plaintiff on October 8, 2015 and, if so, whether any force used was excessive under the circumstances. *See, e.g. Griffin*, 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact

concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."); *Randolph*, 816 F. App'x at 523 (holding that plaintiff's "own sworn statement, even standing alone, is adequate to counter summary judgment" where plaintiff "consistently maintained that several defendants repeatedly assaulted him without provocation while he was handcuffed"); *Bridgewater v. Taylor,* 832 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (holding that disputes of material fact precluded summary judgment where "although [defendant's] evidence consists solely of his own testimony . . . . [that] testimony offers a plausible alternate version of events to [plaintiff's], and it is thus sufficient to indicate the existence of a material dispute as to the amount of force [defendant] used on [plaintiff] and as to whether such force was wanton or unnecessary"). In sum, the Court finds the existence of a dispute of a material fact— whether Defendants used excessive force on Plaintiff on October 8, 2015—which precludes the granting of summary judgment. Accordingly, Defendants' motion for summary judgment seeking dismissal of Plaintiff's excessive force claim is denied.

## II.    Qualified Immunity

Defendants claim that they are entitled to qualified immunity because they did not violate any clearly established law. Plaintiff counters that force used was in response to Plaintiff's noncompliance with an order that was itself inappropriate and therefore any force used was excessive. Specifically, Plaintiff contends that he complied with all of the reasonable orders Defendants gave him including Defendant Reyes's order that Plaintiff assist Defendant Thoban with untying the knot on Plaintiff's belongings, Defendant Thoban's order that Plaintiff cease from doing so, Defendant Reyes's order that Plaintiff leave visiting room #2, and Defendant Reyes's order outside visiting room #2 that Plaintiff put his hands on the wall. The only order Plaintiff admits to not complying with was Defendant Thoban's order to put his nose against the wall, which Plaintiff contends was necessarily malicious and sadistic because Plaintiff's hands were already

on the wall so he did not pose a threat to Defendants. It was in response to Plaintiff's refusal to comply with that allegedly unreasonable order that Defendants pulled Plaintiff's arm behind his back, lifting it for about 30 seconds and holding it behind his back for a total of about two minutes.

Defendants do not dispute, nor could they dispute, that the "right under the Eighth Amendment to be free from excessive force is clearly established." *Manley v. Grossman*, No. 13-CV-1974 (KMK), 2017 WL 4326541, at *10 (S.D.N.Y. Sept. 27, 2017). Instead, they claim that pulling an uncooperative inmate's arm behind his back is not an unreasonable use of force. All of the cases Defendants rely on involve situations in which courts found that pulling a plaintiff's arm behind his back in response to the plaintiff's refusal to comply with a reasonable order did not violate clearly established law. *See, e.g. Kalfus v. N.Y. Presbyterian Hosp.*, 706 F. Supp. 2d 458, 473 (S.D.N.Y. 2010), *aff'd, 4*76 F. App'x 877 (2d Cir. 2012) (finding that "Plaintiff was clearly resisting arrest throughout the entire time that physical force was used . . . . [,] Special Patrolmen used only objectively reasonable force under the circumstances, and that no reasonable juror could find that they engaged in the use of excessive force at the time of Plaintiff's arrest").

Here, the parties dispute (1) whether Defendant Thoban ordered Plaintiff to put his nose against the wall, (2) whether, if Defendant Thoban gave that order, it was unreasonable, and (3) whether Defendants pulled Plaintiff's arm behind his back and lifted it more than necessary. Because there is a dispute of material fact over whether Plaintiff was noncompliant with a reasonable order and whether any force was used on Plaintiff at all, the Court cannot determine at the summary judgment stage whether Defendants are entitled to qualified immunity. *See e.g., Vann v. Sudranski,* No. 16 CV 7367 (VB), 2020 WL 3001072, at *7 (S.D.N.Y. June 4, 2020) (holding that factual dispute concerning whether defendant used excessive force against plaintiff precluded summary judgment on the basis of qualified immunity).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The parties are directed to appear for a telephonic pre-trial conference on February 11, 2021 at 2:00 pm. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. It is the responsibility of Defendants' counsel to make prior arrangements with the appropriate facility to have the pro se Plaintiff appear via telephone.

The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 70. The Clerk of the Court is further directed to mail a copy of this Opinion and Order to Plaintiff at the address listed on ECF and to show service on the docket.

Dated:   December 22, 2020              SO ORDERED:
           White Plains, New York

                                         NELSON S. ROMÁN
                             United States District Judge